**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| RANDALL R. STEICHEN, Appellant, v. 1223 SPRING STREET OWNERS ASSOCIATION, a Washington non-profit corporation; CWD GROUP, a Washington corporation; VALERIE FARRIS OMAN, a citizen of the State of Washington; CONDOMINIUM LAW GROUP, PLLC, a Washington professional limited liability company; DAVID BUCK, a citizen of the State of Washington; DANA REID, a citizen of the State of Washington; JEREMY SPARROW, a citizen of the State of Washington; ROBERT MOORE, a citizen of the State of Washington; CATHERINE RAMSDEN, a citizen of the State of Washington. Respondents. | No. 82407-4-I DIVISION ONE UNPUBLISHED OPINION |

MANN, J. — This appeal arises from a long and tortured dispute between a condominium unit owner and his condominium association. In 2016, the 1223 Spring Street Owners Association (Association) adopted a special assessment to repair the

building's exterior. Randall Steichen failed to make timely payments toward the special assessment and the Association hired an attorney to help collect the debt. While Steichen began making payments, he fell behind on his monthly dues. Dissatisfied with the fees and fines the Association was trying to collect, Steichen sued the Association, the Association's property management company, and the Association's lawyer (collectively respondents). The case was litigated for two years. During the litigation, some or all of the claims against the various respondents were dismissed on summary judgment. At the time of trial, only Condominium Law Group (CLG) remained as a respondent. Steichen declined to participate in the trial and his remaining claims were dismissed under CR 41(b).

Steichen raises multiple issues on appeal. Finding no error, we affirm and award attorney fees to the respondents.

I

A

The Association was established in 1976 under the Horizontal Property Regimes Act (HPRA), ch. 64.32 RCW. Unit owners are members of the Association and are bound by the condominium "Declaration." Under the Declaration, members are required to pay regular and special assessments. The Association is governed by a board of directors (board) who are elected by the Association's members. Steichen bought the condominium unit 500 in 2007. Steichen served as a member of the board from May 2010 to May 2014.

In 2011, while Steichen was a board member, the board began investigating options to remedy water issues with the building. Steichen recommended Belfor

Property Restoration, a former client, to evaluate the building. After an inspection Belfor recommended tuck-pointing the brick facade, significant joint sealant replacement, and resealing the windows. The project, known as the envelope project, was considered for several years.

In 2016, the board moved forward with plans for a special assessment to cover the envelope project. The special assessment was budgeted as a capital expenditure under section 11.1 of the Declaration. At a board meeting, directors and members voted in favor of recommending the special assessment. A vote of the unit owners followed. To reject the special assessment, one-third of the voting interests would have to vote against it. The special assessment was approved with 86.63 percent of the voting interests voting in favor. While some members did not vote, no member voted to reject the special assessment.

Once the special assessment was approved, there were two payment options for unit owners. A minimum initial payment of $10,000, followed by either a single lump sum payment of the remaining balance, or a financing option with installment payments for the remaining balance. Steichen's total allocation for the special assessment was $49,620.

Following member approval, board president David Buck began collecting payment elections from unit owners. Buck e-mailed Steichen directly on February 21, 2017, asking about which payment option Steichen would use. Steichen claimed that this was the first correspondence he had received about the special assessment. While Steichen was included on several e-mails from board treasurer Robert Moore, he claimed that the e-mail address was several years old and defunct. Steichen asked

Buck to forward all information about the special assessment. Buck e-mailed the requested information that same day.

On March 3, 2017, Steichen asked for 30 days to liquidate an investment to pay the special assessment. Buck followed up three times asking whether Steichen planned to pay the full amount or enter into the installment plan. Buck also notified Steichen that the board planned to start collecting installment payments by April 1. On March 21, Steichen signified his intent to pay off the special assessment in full but was unsure if he could do so by April 1. Steichen also said that his first payment would be $10,000 and he would pay the remainder within 90 days.

Buck responded:

> We'll set it up as an HOA financed installment payment ($10,000 down, 15 year am; 5 year fixed rate; monthly payments; front-end financing cost spread over year one allocated prorate per % interests among the financing owners; $250 prepayment fee).

On April 3, Steichen e-mailed Buck stating that he would pay the special assessment in one lump sum but was having trouble obtaining forms to withdraw funds from a retirement account and it would be at least another week. Several weeks went by before Buck asked if Steichen could deliver payment to the lender bank and, if not, told Steichen it would be set up as a loan and Steichen could pay the balance later. Steichen responded that he was travelling, did not have a payment date, and would contact his plan administrator.

Because Steichen did not pay his allocation in one lump sum, he was set up on the installment plan. The first installment payment was due on June 1, 2017, three months after Steichen asserts he was notified of the special assessment. Steichen

-4-

failed to pay the monthly payments. The Association's property management company, CWD, began sending Steichen delinquency letters requesting payment. On September 26, 2017, CWD sent a final demand 10-day notice stating that if payment was not received by October 6, all remedies afforded by law would be exercised, including placing a lien on the property.

Steichen did not respond to the notices and the Association retained attorney Valerie Oman of CLG to help with collection efforts. On November 7, 2017, Oman sent a certified letter to Steichen notifying him of her retention to attempt to collect his delinquent payments of the special assessment.[1] Steichen was advised that payments needed to go through CLG. Oman filed a notice of claim lien against Steichen's unit, which was sent to Steichen with the same letter.

Steichen responded to Oman on December 11, 2017, and proposed a payment plan: $10,000 on or before December 31, 2017, February 28, 2018, and April 30, 2018, with the balance due on or before June 30, 2018. The board accepted the payment schedule with some terms.

On December 29, 2017, Steichen made a $10,000 payment toward the special assessment. On February 12, 2018, Steichen provided a cashier's check for $30,000 to CLG. Following receipt, Oman released the lien on Steichen's unit.

In the meantime, Steichen fell behind on his regular monthly dues. On December 5, 2017, Steichen's direct debit for monthly dues was returned for insufficient funds. Steichen's March and April 2018 monthly dues were also returned for insufficient

---

[1] The amount due included unpaid monthly installment payments for the special assessment, late fees, interest charges, attorney fees and costs, future cost of releasing the lien against the unit, and a security deposit permitted by the Declaration.

funds. Steichen's regular account was referred to Oman for collection and Steichen was locked out of CWD's online payment system. On May 25, 2018, CLG sent a letter to Steichen about his unpaid monthly dues and fees.

On June 30, 2018, Steichen made his final installment payment of $10,000 toward the special assessment. Steichen also conveyed that he was willing to discuss interest and other charges because he wanted to be fair.

On August 13, 2018, Steichen conceded that he owed unpaid monthly dues for the months of April, May, June, July, and August 2018, calling them undisputed amounts. Steichen did not acknowledge the missed December 2017 and March 2018 payments, returned for insufficient funds. Steichen disputed additional charges as "punitive in nature, duplicitous, and patently unreasonable."

On August 14, Steichen e-mailed current board treasurer Meena Selvakumar and notified her that he had sent a cashier's check for $9,514.43, the amount he calculated was due for undisputed amounts and subtracting an overpayment of the special assessment of $380.00.

While communications continued, this was Steichen's last payment to the Association. Steichen never paid late fees, fines, insufficient funds fees, interest on the balance he owed, or legal fees.

B

On December 24, 2018, Steichen sued the Association and five individual board members (collectively Association), the Association's property management company, CWD, the Association's law firm, CLG, and attorney Valerie Oman (collectively CLG). Neither Steichen's first complaint nor amended complaint were in the record before us.

-6-

Steichen's second amended complaint asserted 14 claims, most against all 3 respondents. The Association counterclaimed against Steichen for his unpaid monthly dues.

Protracted litigation occurred for two years. The trial judge held approximately 17 hearings and issued about 60 orders. The trial date was continued three times. Dispositive rulings by the trial court dismissed claims against the Association, CWD, and CLG. By the time of trial, only CLG remained as a respondent.

On the first day of trial, Steichen refused to participate and his remaining claims were dismissed.

Steichen appeals.[2]

II

Steichen's significantly overlength brief identifies 10 issues pertaining to his assignments of error, and then raises 13 arguments and a request for attorney fees in the argument portion of the brief. There is little overlap between the identified issues and arguments. As much as possible, we address each of the arguments in turn.[3]

A

Steichen first argues "Respondents fabricated evidence to conceal their misconduct." Steichen recites purported facts for several pages and then alleges "[r]espondents' concerted, intentional misconduct constitutes fraud, conspiracy, aiding

---

[2] Steichen moved to supplement the record with additional evidence. We deny Steichen's motion. Respondent CLG moved to strike portions of appellant's reply brief because it contained new arguments. We agree and grant CLG's motion to strike.

[3] We decline to address issues identified that lack supporting argument, citation to legal authority, or citation to the record. RAP 10.3(a)(6); State v. Harris, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011).

and abetting, and nuisance." Steichen fails to cite to portions of the record where these claims were dismissed. Neither does he brief the elements of any of these claims nor argue how the evidence demonstrates a genuine issue of material fact. Arguments that are not supported by references to the record, meaningful analysis, or citation to pertinent authority need not be considered. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); see also Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (passing treatment of an issue or lack of reasoned argument insufficient for judicial review). Thus, we decline to review these issues further.

B

On September 23, 2020, the trial court granted the Association's motion for summary judgment on its counterclaim for unpaid monthly dues. The trial court then entered judgment against Steichen for the unpaid dues and attorney fees. Steichen's second argument claims "The Association convinced the trial court that it did not need to establish the validity of the assessments in order to recover." We disagree.

This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court. Marquis v. City of Spokane, 130 Wn.2d 97, 104-05, 922 P.2d 43 (1996). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c). While we construe the evidence and reasonable inferences in the light most favorable to the nonmoving party, if the nonmoving party "'fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment is proper. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The nonmoving party may not rely on speculation or bare assertions to create a material issue of fact. Becker v. Wash. State Univ., 165 Wn. App. 235, 245, 266 P.3d 893 (2011). "[M]ere allegations, denials, opinions, or conclusory statements" do not establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

Steichen was the nonmoving party. After the moving party meets its initial burden to show no issues of material fact, "the inquiry shifts to the party with the burden of proof at trial." Young, 112 Wn.2d at 225. When responding to the summary judgment motion, the nonmoving party cannot rely on mere allegations in the pleadings. Young, 112 Wn.2d at 225. Instead, the party must offer affidavits or other means provided in CR 56 to set forth specific facts showing that there is a genuine issue for trial. Young, 112 Wn.2d at 225-26.

The Association moved for summary judgment on its counterclaim against Steichen for unpaid monthly dues. The Association presented evidence that as a unit owner, Steichen is subject to 1223 Spring Street's condominium Declaration, the Declaration authorizes the Association to collect assessments, and Steichen's nonpayment of monthly dues.

Article 11 of the Declaration governs common expenses and assessments. Each unit owner must pay assessments monthly, or in such other reasonable manner as

designated by the board. The board is tasked with adopting a proposed budget and presenting it to the unit owners. Unless a majority of the unit owners advise the board in writing that they reject the budget, it is considered approved and ratified. The Association provided a copy of Steichen's deed to unit 500 which is subject to restrictions, easements, and covenants.

The 2018 budget was presented at the November 21, 2017 board meeting. For 2019, the board approved budget was distributed to members by e-mail and the board held a budget ratification meeting on November 29, 2018, where the budget was considered ratified. For 2020, the board held a budget ratification meeting on November 19, 2019, where the budget was considered ratified.

Steichen's monthly dues for 2018 were $1,927.44, for 2019 were $2,005.48, and for 2020 were $2,066.40. Monthly dues had not been paid on Steichen's account since April 2018. Steichen conceded that he failed to timely pay his monthly dues, including for the months of April, May, June, July, August, and September 2018. Steichen made a payment toward these unpaid monthly dues on August 23, 2018. But since that August payment, Steichen made no further payments. By August 2020, Steichen owed $52,188.06 in unpaid monthly dues.

In response, Steichen mainly focused on the special assessment and raised procedural issues with the adoption of the budgets. Steichen asserted the budgets violated the time requirements set forth in the Declaration.

First, courts "strive to interpret restrictive covenants in such a way that protects the homeowners' collective interests and gives effect to the purposes intended by the drafters of those covenants to further the creation and maintenance of the planned

community." Jensen v. Lake Jane Ests., 165 Wn. App. 100, 106, 267 P.3d 435 (2011) (citing Lakes at Mercer Island Homeowners Ass'n v. Witrak, 61 Wn. App. 177, 181, 810 P.2d 27 (1991)).

Section 11.1 of the Declaration provides that within 30 days before each calendar year, the board must adopt a proposed budget. Within 30 days after adoption, the board must mail or deliver a summary of the budget to all unit owners. Unless unit owners having a majority of the votes advise the board in writing that they reject the budget within 30 days following mailing or delivery, the budget is considered approved and ratified. Steichen asserts that because the board adopted a proposed budget early, not within 30 days before each calendar year, the Declaration was violated.

The overall purpose of section 11.1 is clear: to have a new budget in place by the beginning of the year and to provide unit owners an opportunity to review the budget and, if necessary, reject it. To do that, the board has developed a habit of adopting a proposed budget in the late fall so that unit owners have 30 days before the calendar year to review it. This ensures that the process to collect dues starts smoothly. This process protects unit owners' collective interests. It was also the process when Steichen served on the board.

Second, in its motion for summary judgment, and on appeal, the Association argued that unit owners cannot withhold assessment payments as a form of protest to board actions. In support, the Association relied on: Panther Lake Homeowner's Ass'n v. Juergensen, 76 Wn. App. 586, 887 P.2d 465 (1995); Rivers Edge Condo. Ass'n v. Rere, Inc., Pa. Super. 196, 568 A.2d 261 (1990); and Blood v. Edgar's, Inc., 36 Mass. App. Ct. 402, 632 N.E.2d 419 (1994).

In Panther Lake, this court considered whether deficiencies in a capital improvement project directed and overseen by an association allows a member of that association to refuse to pay assessments. 76 Wn. App. at 589. The Panther Lake court considered Rivers Edge. In Rivers Edge, a condominium owner refused to pay assessments based on a common area project with structural defects. 390 Pa. Super. at 199. The court determined that the defects did not provide the individual owner with a defense to the assessments:

> [A]ppellant's action in withholding his condominium assessments, even assuming that he has suffered the property damage he alleges, is not justified by the language of the [bylaws], the statutes of this Commonwealth, or general public policy considerations.

Rivers Edge, 390 Pa. Super. at 199.

In Panther Lake, the court agreed "with the reasoning in Rivers Edge" and held that "defects in the Association's capital improvements do not provide members with a defense to assessments imposed to pay for such improvements." 76 Wn. App. at 590-91. The court held that lot owners' "remedies are limited to making their wishes known to the Association, casting their votes, and seeking declaratory relief if the Association acts beyond its authority. Lot Owners are not permitted to compound the Association's problems by unilaterally withholding assessments for capital improvements." Panther Lake, 76 Wn. App. at 591.

Finally, the Association cited Blood v. Edgar's Inc. In Blood, a unit owner refused to pay their portion of the assessments for common expenses, claiming illegality with the assessments. 36 Mass. App. Ct. at 403. The court determined that a unit owner in a condominium "may not challenge a common expense assessment by refusing to pay

it." Blood, 36 Mass. App. Ct. at 404. Failure to pay common expense assessments "would have a serious financial impact on the stability of a condominium association." Blood, 36 Mass. App. Ct. at 405.

Here, the trial court zeroed in on the issue at the heart of the Association's counterclaim: Steichen, by his own admission, failed to pay his monthly dues, in protest over the way the Association handled the special assessment. Nothing prevented Steichen from continuing to pay his monthly dues while negotiations continued over the late fees, fines, and attorney fees associated with the special assessment. CLG advised Steichen repeatedly that payments could be made through CLG and yet he refused and the debt grew.

Finally, Steichen asserts that the ledgers established a genuine issue of fact over whether Steichen's account had a credit because of his payments toward the special assessment. But "[a]n argument that was neither pleaded nor argued to the superior court on summary judgment cannot be raised for the first time on appeal." Johnson v. Lake Cushman Maint. Co., 5 Wn. App. 2d 765, 780, 425 P.3d 560 (2018) (citing Sourakli v. Kyriakos, Inc., 144 Wn. App. 501, 509, 182 P.3d 385 (2008)); see also RAP 2.5(a) (appellate courts generally will not review a claim of error not raised in the trial court). Steichen did not make this argument in his pleadings in response to summary judgment. For this reason, we do not consider Steichen's new argument on appeal. Johnson, 5 Wn. App. 2d at 780 (citing Sourakli, 144 Wn. App. at 509).

Because Steichen failed to raise a dispute of material fact over the monthly dues and judgment was appropriate as a matter of law, the trial court did not err in granting

-13-

the Association's motion for summary judgment on its counterclaim for unpaid monthly dues.[4]

C

After briefing, on November 2, 2020, the trial court awarded the Association $28,650 in attorney fees based on its successful counterclaim for unpaid monthly dues. Steichen's third argument asserts, "The trial court compounded its error by erroneously awarding the Association attorney fees." But Steichen fails to set forth any legal or factual argument in support of his claimed error. Thus, we decline to consider it. Cowiche Canyon, 118 Wn.2d at 809.[5]

D

The trial court entered its order granting the Association's motion for summary judgment on its counterclaim against Steichen for unpaid monthly dues on September 23, 2020. The order awarded the Association its attorney fees under the Declaration and RCW 64.34.364(1) subject to being segregated to reflect only time spent in connection with the collection of monthly dues. The order declined to enter the Association's proposed judgment without further briefing. On January 29, 2021, the trial court granted the Association's motion for CR 54(b) certification of the trial court's order granting summary judgment on the Association's counterclaim against Steichen for

---

[4] Steichen also asserts that the trial court erred by relying on an inadmissible ledger. But Steichen failed to object before the trial court, thus waiving this claim of error. RAP 2.5(a).

[5] In a footnote, Steichen asserts that he moved for reconsideration of the counterclaim judgment and fee award, "which was erroneously denied." Steichen again provides no legal or factual argument in support of this claim.

monthly dues and order awarding attorney fees.[6]  This order was not itself a final judgment but instead directed entry of final judgment.  The trial court granted the Association's motion for entry of final judgment on April 23, 2021.

Steichen's fourth argument is that "The trial court erred in entering a second, purported judgment on the Association's Counterclaim, which included a foreclosure decree."  We disagree.

First, the trial court did not enter a second judgment.  RCW 4.64.030(3) proscribes the form a judgment summary must take "and a judgment does not take effect, until the judgment has a summary in compliance with this section."  The judgment entered on April 23, 2021, was entered pursuant to the trial court's prior order certifying entry of final judgment on the Association's claim under CR 54(b).  The April 23, 2021 judgment is the only final judgment entered on the Association's counterclaim.

Next, without citing any authority, Steichen asserts that the April 23, 2021, final judgment expanded the scope of the first judgment by awarding mortgage foreclosure rights.  Again, the April 23, 2021 judgment is the only judgment entered by the trial court.  In addition, the Association's proposed order granting summary judgment sought entry of a formal judgment, a lien, foreclosure rights, an execution against Steichen for any deficiency, and for the right to seek an appointment of a receiver of Steichen's unit.  As did the Association's motion for entry of a final judgment.  Thus, Steichen had notice that the Association was seeking foreclosure rights.  Steichen fails to argue or cite authority as to why the trial court's entry of foreclosure rights was erroneous.

---

[6] When more than one claim for relief is presented in an action, CR 54(b) allows a trial court to direct entry of final judgment as to one or more, but fewer than all the claims upon findings that there is no just reason for delay.

The trial court did not err in entering a final judgment.

E

After entry of judgment, the Association sought a writ of garnishment against J.P. Morgan Chase Bank. Steichen opposed the writ claiming that he had no interest in the garnished funds. After protracted litigation before a separate judge, the trial court agreed and dismissed the writ. The trial court awarded Steichen $8,680.00 in attorney fees and $264.96 in costs.

Steichen's fifth argument is that he "was entitled to recover fees and costs in the garnishment proceedings." Steichen contends that the trial court arbitrarily awarded less than one-third of the attorney fees expended in litigating the invalidity of the garnishment. But the extent of Steichen's argument is simply, "There was no basis for reducing Steichen's fees and costs." Steichen designated no records for this court's review, failed to cite to the record, and failed to set forth any legal argument on this purported error. As a result, we decline to consider it. Cowiche Canyon, 118 Wn.2d at 809.

F

On October 13, 2020, the trial court granted the Association's motion for summary judgment dismissing all claims alleged by Steichen, including his claim for breach of contract and failure to comply with the notice and meeting requirements of the Washington Condominium Act (WCA), ch. 64.34 RCW. In his sixth argument, Steichen asserts, "The special assessment is invalid because the Board failed to comply with applicable law and its governing documents." We disagree.

In his complaint, Steichen asserted that the Association violated RCW 64.34.308(3) and (4), and breached its duties under RCW 64.34.308 and the governing documents. Under RCW 64.34.308(3), within 30 days after adoption of a proposed budget, the board must provide a summary of the budget to unit owners and set a date for a meeting of the unit owners to consider ratification of the budget at least 14 nor more than 60 days after mailing the summary. Steichen asserted that to comply with RCW 64.34.308, the board needed to set a date for a meeting of the unit owners to discuss the special assessment. Steichen also asserted that the board's summary of the special assessment did not comply with RCW 64.34.308(4) which outlines what needs to be included in a summary of the budget provided to the unit owners.

On the Association's motion for summary judgment, the trial court disagreed and dismissed all claims against the Association, and individual board members. Our review is de novo and we engage in the same inquiry as the trial court. Marquis, 130 Wn.2d at 104-05.

Under section 11.1 of the Declaration, a capital expenditure or improvement in excess of $100,000 is considered approved and ratified unless one-third or more of the unit owners advise the board in writing that they reject it. The section also requires the board to "mail or deliver" a summary of the expenses or budget within 30 days after board adoption.

On October 15, 2016, the board treasurer, Rob Moore, e-mailed all unit owners a copy of the 2017 proposed budget and notified them it would be voted on at the next board meeting. The e-mail also explained that the building committee continues to review the envelope project and the final cost and timing was still being determined but

would likely cost between $40,000 to 50,000 per unit owner. Because this was a capital item, the e-mail explained that the special assessment would be handled outside of the operating budget.

Moore sent a follow-up e-mail on October 23, 2016, after the October board meeting. The proposed 2017 budget was attached, and the e-mail explained that the envelope project was still being reviewed but would "likely be a significant expense to Owners in 2017." It also notified unit owners that the building committee was likely to discuss the envelope project at the next board meeting. Steichen was included in both e-mails. Steichen claimed, however, that he had not used this e-mail address in several years.

Buck e-mailed the unit owners on November 14, 2016, with a reminder of the November 15 board meeting and notice that the board would be preparing a formal notice requesting approval of a special assessment. Steichen was not included on this e-mail. At the November 15, 2016 board meeting, with several unit owners in attendance, a majority of the board voted to submit the special assessment for owner approval. Another informational meeting for unit owners was scheduled for November 22, 2016, to answer any questions unit owners may have.

Buck prepared a special assessment packet to be distributed to the unit owners. The packet contained the language from section 11.1 of the Declaration, that a capital expenditure in excess of $100,000 can be enacted unless opposed by at least one-third of the voting interests. The packet also contained a ballot for unit owners to use to vote on the special assessment. Buck e-mailed the packet and ballot to all unit owners

except Steichen. Buck also submitted a declaration that he hand delivered the packet to the mail slots of all unit owners, including Steichen.

By November 29, 2016, 72.826 percent of voting interests had voted for the special assessment, thus approving it. The final vote tally approved the special assessment with 86.63 percent of the voting interests voting in favor. No member voted to reject the special assessment.[7]

Steichen asserts that he never received notice of the special assessment before the vote occurred. He asserts that the e-mail used by the board treasurer was invalid and had been for years. Steichen was not included on Buck's November e-mail or the e-mail containing the packet on the special assessment. As for whether Steichen received the packet by mail or delivery to his mail slot, it is undisputed that Steichen no longer resided in the unit. And Steichen submitted an <u>unsigned</u> partial declaration from his daughter Alison, who resided in the unit at that time and did not recall receiving such a large packet.

At any rate, even if Steichen had received notice of the vote and voted against the special assessment, the special assessment was approved by 86.63 percent of the voting interests voting in favor. Thus, it was not opposed by one-third of the voting interests, nor could it be if Steichen voted against it.

---

[7] Steichen references unit 700 being excluded from the same e-mails as not a coincidence as they were the only owners who did not reside at 1223 Spring Street. But this is misleading. Unit 700 is owned by an LLC. The residents of the unit regularly received e-mails, including the e-mails about the special assessment, and hard copy in their mail slot notices from the board that they forwarded to the LLC. On November 29, 2016, the LLC abstained from the vote but elected the financing option. No other unit owner alleged issues with notice.

Steichen next asserts that the special assessment is invalid because its adoption did not comply with the budgetary, notice, and meeting requirements in RCW 64.34.308(3) and (4). Steichen argues that the Association's amended declaration did not take effect until July 1, 1990, and thus needed to adhere to the WCA.

Chapter 64.34 "applies to all condominiums created within this state after July 1, 1990." RCW 64.34.010(1) (emphasis added). The chapter expressly applies several sections to condominiums created in this state before July 1, 1990, but not RCW 64.34.308(3) and (4). RCW 64.34.010(1).

The Association was established in 1976 under the HPRA. The Declaration that governed the adoption of the special assessment was an amendment to the Declaration. It was recorded on June 29, 1990. "Recording gives constructive notice to all future purchasers." Mohandessi v. Urban Venture LLC, 13 Wn. App. 2d 681, 696, 468 P.3d 622 (2020) (citing Shephard v. Holmes, 185 Wn. App. 730, 740-41, 345 P.3d 786 (2014) (citing Strong v. Clark, 56 Wn.2d 230, 232-33, 352 P.2d 183 (1960)). Because the Declaration was recorded before July 1, 1990, RCW 64.34.308(3) and (4) do not apply.

The board followed the procedures set out in section 11.1 of its Declaration: a majority of the board of directors voted to submit the special assessment for owner approval, unit owners were notified of the special assessment in writing within 30 days of that vote, and 86.63 percent of the owners approved the special assessment. Because the board's process complied with section 11.1 of the Declaration, and was not subject to RCW 64.34.308(3) and (4), the process appears valid.

But even if not correctly adopted, the trial court determined that Steichen had ratified the assessment. "An agreement may be made fully operative by subsequent validation." McLendon v. Snowblaze Recreational Club Owners Ass'n, 84 Wn. App. 629, 632, 929 P.2d 1140 (1997) (citing 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1.6, at 19 (Joseph M. Perillo rev. ed. 1993); RESTATEMENT (SECOND) OF CONTRACTS § 380 cmt. a (AM. L. INST. 1979)).

The relationship between a condominium association and a unit owner is like that of a principal and an agent. Brewer v. Lake Easton Homeowners Ass'n, 2 Wn. App. 2d 770, 778, 413 P.3d 16 (2018). "Just as a principal can ratify otherwise unauthorized acts of an agent, a homeowner can ratify an otherwise unlawful act by a homeowners' association." Brewer, 2 Wn. App. 2d at 778. Ratification occurs when a homeowner either (1) voluntarily accepts the benefits and obligations of the association's actions with full knowledge of the facts warranting rescission, or (2) accepts the benefits and obligations imposed by the association without inquiry. Brewer, 2 Wn. App. 2d at 778 (citing Ebel v. Fairwood Park II Homeowners' Ass'n, 136 Wn. App. 787, 793-94, 150 P.3d 1163 (2007); Bill McCurley Chevrolet, Inc. v. Rutz, 61 Wn. App. 53, 57, 808 P.2d 1167 (1991)).

Steichen ratified the special assessment and is estopped from challenging it now. "A party ratifies an otherwise voidable contract if, after discovering facts that warrant rescission, [the party] remains silent or continues to accept the contract's benefits." Snohomish County v. Hawkins, 121 Wn. App. 505, 510-11, 89 P.3d 713 (2004). The party must act voluntarily and with full knowledge of the facts. Hawkins, 121 Wn. App at 511.

It is undisputed that Steichen knew there were issues with the notice provided to him. When responding to Oman about his unpaid monthly dues, Steichen stated:

> The first time I heard about a Special Assessment was when I was accused of being in default. I did not receive any notice of the proposed assessment, I was not provided an opportunity to participate in the decision-making process, and I was not afforded an opportunity to vote on the assessment . . . But, after I was made aware of the Special Assessment, I did pay the entire assessment amount as and when I agreed to do so.

Steichen repeatedly agreed to pay the special assessment. Later, Steichen did pay the special assessment in three installment payments. His last payment toward the special assessment was on June 30, 2018.

The trial court did not err in granting summary judgment, finding that the special assessment was valid and that Steichen ratified it.

G

After dismissal of Steichen's claims, the trial court granted the Association, CLG, and CWD's motion for an award of attorney fees under RCW 64.34.455.[8] In his seventh argument, Steichen asserts that "The trial court erroneously awarded Respondents fees pursuant to an Act they asserted was inapplicable." We disagree.[9]

Attorney fees may be awarded when authorized by a contract, a statute, or a recognized ground in equity. Mohandessi, 13 Wn. App. 2d at 701. Whether a contract or law authorizes an attorney fee award is a question of law and reviewed de novo. Kaintz v. PLG, Inc., 147 Wn. App. 782, 785-86, 197 P.3d 710 (2008).

---

[8] The Association and CLG also sought attorney fees under 15 U.S.C. § 1692k(a)(3). Steichen does not address the federal statute.

[9] Before the trial court, Steichen's response to the motions for attorney fees was stricken as untimely under King County Superior Court Local Civil Rule (LCR) 7(b)(4)(g).

The WCA, RCW 64.34.455, provides:

> If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party.

Washington law is clear that RCW 64.34.455 allows for an award of attorney fees against an unsuccessful plaintiff. Bilanko v. Barclay Ct. Owners Ass'n, 185 Wn.2d 443, 452 n.8, 375 P.3d 591 (2016) ("RCW 64.34.455 grants courts the discretion to award attorney fees to the 'prevailing party.'"); Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 713, P.3d 898 (2000) ("A defendant can be awarded fees as a prevailing party under the Condominium Act."). The WCA's remedies "shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." RCW 64.34.100.

Steichen argues that the respondents were not entitled to fees under RCW 64.34.455 because they argued throughout the case that the WCA did not apply. Steichen's argument is misplaced. While the respondents argued that the notice and meeting requirements in RCW 64.34.308 did not apply, they did not argue that RCW 64.34.455 was inapplicable.

RCW 64.34.010(1) explicitly states that section 64.34.455 applies "to all condominiums created in this state before July 1, 1990 . . . with respect to events and circumstances occurring after July 1, 1990" unless it invalidates or supersedes existing, inconsistent provisions of the declaration or bylaws. Steichen did not identify an inconsistent provision in the Declaration.

Steichen next asserts that CLG and CWD are not subject to the WCA. But, as a unit owner, Steichen is subject to the WCA and the Declaration. He violated provisions of the WCA and the Declaration by not paying his regular monthly dues. Steichen then chose to sue all of the respondents under largely the same theories. The respondents were "adversely affected" by Steichen's actions.

Because Steichen violated the WCA and the Declaration, and the respondents were adversely affected by Steichen's failure to comply, the trial court did not err in awarding attorney fees.[10]

H

In his eighth argument, Steichen contends that "CLG collects debts for third parties, and is therefore subject to the [Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. §§ 1692-1692p], the [Washington Collection Agency Act (WCAA), ch. 19.16 RCW], and the [Consumer Protection Act (CPA), ch. 19.86 RCW]." But Steichen fails to acknowledge that most of these claims remained at the time of trial and Steichen failed to prosecute them. Thus, we disagree.

These claims against CLG remained for trial: claims under the FDCPA, 15 U.S.C. § 1692e based on assessment of late fees, e-mails sent on December 29, 2017, and access to records; per se CPA claim based on an alleged violation of WCAA, RCW

---

[10] In a footnote, Steichen asserts that the fee awards are unreasonable, duplicative, not segregated, the interest rate conflicts with the Declaration, and the trial court erred by striking Steichen's objection and denying sanctions and reconsideration. This argument is not adequately briefed and argued, therefore we will not consider it. Cowiche Canyon, 118 Wn.2d at 809.

19.16.110; per se CPA claims based on the remaining FDCPA claims; and section G of Steichen's claim for a declaratory judgment.[11]

When Steichen failed to participate in the trial, the trial court dismissed the remaining claims.[12]  Under CR 41(b), for failure of the plaintiff to prosecute or to comply with these rules or any order of the court, a defendant may move to dismiss an action or any claim against him.  "A trial court may exercise its discretion to dismiss an action based on a party's willful noncompliance with a reasonable court order."  Walker v. Bonney-Watson Co., 64 Wn. App. 27, 37, 823 P.2d 518 (1992).  It may also exercise its discretion to dismiss for the failure of the plaintiff to prosecute.  CR 41(b).  "The failure to attend trial is both a failure to prosecute and a failure to comply with the order setting trial."  Alexander v. Food Servs. of America, Inc., 76 Wn. App. 425, 430, 886 P.2d 231 (1994).

It is a long-standing rule that abandoned issues will not be addressed on appeal.  RAP 2.5(a); Green v. Normandy Park, 137 Wn. App. 665, 688, 151 P.3d 1038 (2007).  This court need not consider on appeal a theory that the trial court "had no effective opportunity" to consider and rule on at trial.  Com. Credit Corp. v. Wollgast, 11 Wn. App. 117, 126, 521 P.2d 1191 (1974) (citing Bellevue Sch. Dist. 405 v. Lee, 70 Wn.2d 947, 950, 425 P.2d 902 (1967)).  Because Steichen abandoned these issues, we decline to address them.

---

[11] Section G of Steichen's claim for a declaratory judgment states, "That Defendant Oman and Defendant CondoLaw Group violated the Washington Collection Agency Act by not obtaining a license to act as a collection agency."

[12] Steichen has not assigned error to this decision by the trial court.

Insomuch as Steichen asserts that his motion for partial summary judgment on this issue should have been granted earlier in the case, we disagree. Our case law is unequivocal—the denial of a summary judgment motion is not a final order that can be appealed under RAP 2.2(a). In re Ests. of Jones, 170 Wn. App. 594, 605, 287 P.3d 610 (2012); DGHI, Enters. v. Pac. Cities, Inc., 137 Wn.2d 933, 949, 977 P.2d 1231 (1999).

I

CLG filed a third motion for summary judgment on August 28, 2020. In its motion, CLG moved to dismiss all claims that remained. The motion was noted for hearing on September 25, 2020. The trial court granted the motion in part on September 28, 2020, and continued oral argument, without further briefing, to October 2, 2020. In its order, the trial court dismissed remaining claims but reserved several claims for trial.

In his ninth argument Steichen contends that "Instead of enforcing the law, the trial court rewarded CLG's misconduct." We disagree.[13]

Steichen first asserts that the trial court erred in dismissing his claim that CLG violated 15 U.S.C. § 1692c by sending two e-mails after 9:00 p.m. 15 U.S.C. § 1692c(a) generally prohibits debt collectors from communicating with a consumer at an unusual time, and that the convenient time for communicating with a consumer is after 8:00 a.m. and before 9:00 p.m. local time in the consumer's location.

---

[13] At the outset, while Steichen identifies four alleged FDCPA violations that were dismissed, Steichen fails to present argument on two of the claims. As a result, we decline to address them. Cowiche Canyon, 118 Wn.2d at 809.

In TransUnion, LLC v. Ramirez, the Supreme Court explained that bare procedural violations of a federal statute are not enough on their own to establish standing. ___ U.S. ___, 141 S. Ct. 2190, 2213, 210 L. Ed. 2d 568 (2021) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 341, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation." TransUnion, 141 S. Ct. at 2205 (emphasis omitted). Federal courts have extended this holding to the FDCPA. Barclift v. Keystone Credit Servs., LLC, 585 F. Supp. 3d 748, 760 (E.D. Penn. 2022) (dismissing claim for violating 15 U.S.C. § 1692c(b) because bare procedural violation of the FDCPA alone does not establish concrete harm). In Dolan v. Sentry Credit, Inc., the U.S. District Court explained that Congress's intent, in passing the FDCPA, was to protect the consumer by eliminating abusive debt collection practices, however, Congress did not intend "to create hypertechnical protections." 2018 WL 6604212, at *11 (W.D. Wash. Dec. 17, 2018) (court order).

There is no case law supporting an FDCPA claim under 15 U.S.C. § 1692c(a) for e-mails sent by a debt collector. Nor did Steichen provide evidence that CLG's alleged procedural violation caused him concrete harm.

Steichen next asserts that the trial court erred by dismissing his claim under 15 U.S.C. § 1692g. Steichen claimed that CLG "overshadow[ed] and contradict[ed] the required validation notice."

The FDCPA requires a debt collector to send the debtor a written notice that informs the debtor of the amount of the debt, to whom the debt is owed, the right to dispute the debt within 30 days of receipt of the letter, and the right to obtain verification

-27-

of the debt. 15 U.S.C. § 1692g(a). Notice of the debtor's right to dispute the debt must not be overshadowed. 15 U.S.C. § 1692g(b). Overshadowing may exist where language in the notice would confuse a least sophisticated debtor. Terran v. Kaplan, 109 F.3d 1428, 1433 (9th Cir. 1997).

CLG sent a letter to Steichen on May 25, 2018, about Steichen's unpaid monthly dues. That letter meets the requirements of 15 U.S.C. § 1692g(a). On June 13, 2018, CLG sent Steichen an e-mail. The e-mail was a follow-up to the letter stating, "we would like to work with you on a payment plan or other resolution." Nothing in the e-mail overshadowed the May 25 letter, or the 30-day validation period. Under 15 U.S.C. § 1692g(b), "[c]ollection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period."

Thus, no genuine dispute of material fact remained on these two claims and the trial court did not err in dismissing them.

J

On September 25, 2020, Steichen moved for sanctions against CLG under CR 11 and CR 56. Steichen argued that CLG and its attorney: (1) "persistently and inexcusably misled the Court regarding the WCAA"; (2) misrepresented the express terms of the FDCPA; (3) falsely represented the holdings in an unpublished opinion of this court, Pardee v. Evergreen Shores Beach Club,[14] and (4) engaged in discovery abuses. The trial court denied Steichen's motion. In his tenth argument, Steichen

---

[14] No. 53126-7-II (Wash. Ct. App. June 23, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053126-7-II%20Unpublished%20Opinion.pdf.

-28-

contends the trial court "erred in refusing to impose sanctions against CLG and its counsel for clear misconduct." We disagree.

We review grant or denial of sanctions under an abuse of discretion standard. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993). "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds." Fisons, 122 Wn.2d at 339. "The sanction rules are designed to confer wide latitude and discretion upon the trial judge to determine what sanctions are proper in a given case." Fisons, 122 Wn.2d at 339 (internal citation removed).

CR 11 allows sanctions when a litigant "fil[es] a claim for an improper purpose, or if the claim is not grounded in fact or law." In re Recall of Piper, 184 Wn.2d 780, 787, 364 P.3d 113 (2015). CR 56(g) allows the court to order a party filing affidavits in bad faith or solely for the purpose of delay in relation to a summary judgment hearing to order the party to pay the other party's reasonable attorney fees. "In deciding upon a sanction, the trial court should impose the least severe sanction necessary to carry out the purpose of the rule." Biggs v. Vail, 124 Wn.2d 193, 197, 876 P.2d 448 (1994) (citing Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 225, 829 P.2d 1099 (1992)).

Steichen first asserted that in its motion for summary judgment, CLG misled the trial court about the WCAA by providing legislative history that pertained to the FDCPA. In its reply materials on summary judgment, CLG accepted responsibility for the mistake and the trial court knew of the error before ruling. In denying sanctions the trial court explained the "mistake, which frankly was clear from CondoLaw's motion and Exhibits 2

and 3 of its counsel's declaration, goes to the weight a court would give CondoLaw's briefing."

Steichen next pointed to counsel's oral argument from June 21, 2019, on how the court should interpret RCW 19.16.100(4) and whether lawyers are exempt from the definition of collection agency. The trial court did not consider CLG's argument to have violated CR 11, and it could not have since it was not made in a signed pleading.

Steichen next asserted that CLG's argument that Steichen's claims under 15 U.S.C. §1692c(a) cannot apply to an e-mail ignores the broad definition of "communication" under the FDCPA. As the trial court pointed out, neither party cited cases discussing whether the FDCPA's definition of communication applies to e-mails and the court was set to decide who made the better argument at the pending hearing on October 16.

Steichen then asserted that CLG falsely represented the holding of Pardee. In its motion, CLG admitted that the case dealt with a different statute. That CLG unpersuasively relied "on a readily distinguishable case goes to the weight a court would give its briefing." But the trial court found it did not warrant sanctions.

Finally, Steichen pointed to two purported discovery abuses by CLG. The trial court held that it could not award CR 11 sanctions for alleged discovery sanctions because CR 37 governs discovery violations and Steichen had not brought a CR 37 motion.

In summary, the trial court found Steichen "failed to identify conduct sanctionable under either CR 11 or 56(g)" and denied the motion. The trial court did not abuse its discretion.

K

In his eleventh argument, Steichen asserts that the "trial court's erroneous sanction rulings resulted from judicial bias" and challenges several sanctions rulings that were imposed against him.  We disagree.

Steichen first asserts that the trial court erred by awarding CLG $1,400 for its attorney fees for responding to Steichen's motion to strike.  On August 6, 2019, Steichen filed his second amended complaint.  Three days later, the court set an October 11, 2019 agreed hearing date on CLG's CR 12(b)(6) motion to dismiss.  Under court rules, CLG's deadline to file its motion was September 13, 2019.  Late in the afternoon on September 9, 2019, Steichen moved to shorten time under King County Superior Court Local Civil Rule (LCR) 7(b)(10)(C) and moved to strike the agreed October 11 hearing date.  The motion to shorten time requested a hearing on September 11—two days later.

Because the parties fully briefed the motion to strike, the trial court ultimately agreed to hear the motion on September 11.  But the court explained:

> Plaintiff has not shown good cause to shorten time for the hearing of his motion to strike.  Indeed, there was no good reason for plaintiff to have brought the motion at all.  LCR 7(b)(10)(F) allows this Court to deny or grant the motion and impose such conditions as the court deems reasonable.  Because the parties have already fully briefed the motion to strike, this Court will consider that motion on September 11, 2019, as plaintiff requests, but will impose the condition that plaintiff and plaintiff's counsel jointly and severally pay defendants' attorney's fees and costs incurred in responding to the motion to shorten time.

The trial court explained its reasoning and complied with LCR 7(b)(10)(f) in awarding sanctions. The trial court did not abuse its discretion in ordering Steichen to pay CLG's attorney fees.[15]

Steichen next asserts that the trial court erred by imposing terms against him for a CR 56 motion. Steichen had moved to continue CLG's motion for summary judgment from December 6, 2019, to February 2020. Steichen filed the motion to continue the same day that Steichen's response to CLG's motion was due, November 25, 2019, and noted the motion for December 3, 2019. This failed to provide the required notice of six court days. LCR 7(b)(4)(A). CLG moved for CR 11 sanctions, which the trial court declined to impose. Instead, the trial court imposed "appropriate terms with the intent of reinforcing to plaintiff's counsel the importance of complying with court rules" and held Steichen and his counsel jointly and severally responsible for paying $1,000 to CLG.

Steichen seems to argue that the trial court erred because Steichen had not filed material late, he had failed to give proper notice. But LCR 7(b)(4)(g) explicitly provides that "[a]ny material offered at a time later than required by this rule . . . will not be considered by the court over objection of counsel except upon the imposition of appropriate terms." (Emphasis added). It is undisputed that Steichen gave less than the required notice. As a result, the trial court imposed appropriate terms against Steichen. This was not an abuse of discretion.[16]

---

[15] In a footnote, Steichen asserts that the trial court erroneously denied his renewed opposition and motion for reconsideration of this order. Placing an argument in a footnote is, at best, ambiguous or equivocal as to whether the argument is part of the appeal, and this court may decline to address an argument presented in this fashion. State v. Johnson, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993).

[16] Steichen also asserts that the trial court erroneously entered judgment on the two fee awards when the parties had stipulated that enforcement would be deferred until Steichen's claims were fully

Finally, Steichen asserts that the trial court erred in awarding CLG $900 for evasive discovery responses and finding him in contempt. The trial court granted CLG's motion to compel in part, ordering Steichen to supplement two discovery responses. The trial court found that before CLG moved to compel, the parties conferred multiple times about the need for Steichen to supplement various responses. But it was CLG's motion to compel that "successfully incentivized [Steichen]" to finally provide the supplemental information and therefore reasonable expenses of $900 for CLG was just.

When a motion to compel is granted in part and denied in part, CR 37(a)(4) permits a trial court to apportion the reasonable expenses incurred among the parties in a just manner. Thus, the trial court's order was not an abuse of discretion.

When Steichen failed to pay the $900 in the 10 days proscribed by the order, CLG moved for contempt. Steichen asserts that the trial court failed to find that Steichen had a current ability to perform the act previously ordered. RCW 7.21.030. But the trial court explicitly found, based on Steichen's declaration, that Steichen had not shown he could not comply but that his counsel had directed him not to comply. Thus, the trial court found Steichen in contempt.[17] RCW 7.21.010(1)(b). This was consistent with CR 37(b)(2)(D), which permits the court to enter an order for contempt for failure to comply with an order compelling discovery. The trial court did not abuse its discretion.

_____

resolved. There is no evidence in the record before this court that CLG has sought to enforce these two awards. Thus, any purported error is moot.

[17] This court reviews the trial court's contempt findings for an abuse of discretion. Rhinevault v. Rhinevault, 91 Wn. App. 688, 694, 959 P.2d 687 (1998).

L

Steichen's twelfth argument contends that "Respondents committed conversion by taking funds from Steichen's bank account." Steichen focuses his argument on respondent CWD, with only one sentence devoted to each of the other respondents. We decline to address Steichen's conversion claims against CLG and the Association. We otherwise disagree.[18]

Conversion requires "willful interference with chattel," "by either taking or unlawful retention," which deprives the owner of possession. Burton v. City of Spokane, 16 Wn. App. 2d 769, 773, 482 P.3d 968 (2021). In some cases, money may become the subject of conversion but "there can be no conversion of money unless it was wrongfully received by the party charged with conversion, or unless such party was under obligation to return the specific money to the party claiming it." Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys., 104 Wn.2d 353, 378, 705 P.2d 1195 (1985) (citing Davin v. Dowling, 146 Wash. 137, 140, 262 P. 123 (1927); Seekamp v. Small, 39 Wn.2d 578, 583, 237 P.2d 489 (1951); H.D. Warren, Annotation, Nature of Property or Rights Other than Tangible Chattels Which May be Subject of Conversion, 44 A.L.R.2d 927 (1955)).

On October 2, 2020, CWD moved for summary judgment and dismissal of Steichen's conversion claim. In Steichen's second amended complaint, he asserted that all respondents had committed conversion by willfully and illegally imposing the special assessment, "unlawfully and without notice, charging late fees, fines, interest,

_____

[18] Steichen also appears to argue that the respondents committed conversion by interfering with possession of his real property. But because Steichen's brief devotes only one sentence to this claim we do not address it.

-34-

finance charges, and legal fees and costs," and "debiting funds from [Steichen's] bank account without authority to do so."

The trial court granted CWD's motion in part and denied it in part. The trial court dismissed Steichen's conversion claim relating to real and personal property, and because the trial court found that Steichen "owed and was properly assessed the amounts for the special assessment," the remaining claims were "dismissed to the extent they relate to charges, debits, and payments for the special assessment." Thus, Steichen's conversion claim against CWD only remained to the extent Steichen was assessed fees and fines. In its third motion for summary judgment, CWD moved to dismiss all remaining claims against CWD, and argued that the conversion claim could not stand since Steichen never paid any fees or fines and the Association had since dropped all claims for late fees. The trial court agreed and granted CWD's third motion for summary judgment, dismissing all remaining claims against CWD.

Steichen argues that CWD made automatic withdrawals from his checking account without his authority. These three withdrawals of $382.89 occurred on August 5, 2017, February 5, 2018, and March 6, 2018. The withdrawals were the monthly installment payments toward the special assessment. Steichen had only authorized CWD to automatically withdraw his regular monthly dues from this account each month.

But Steichen was notified several times by Buck that if he could not make a payment toward the special assessment by April 1, 2017, the Association would start to collect installment payments. On March 9, 2017, Buck stated, "[w]e would like to have this resolved by April 1 which is when we will start to collect installment payments." And on March 16, 2017, Buck asked, "Randy, can you let me know your intentions regarding

payment of the special assessment. Everyone except you has made either an initial payment of $10,000+ or payment in full. We plan to start collecting monthly installment payments April 1." On March 21, 2017, in response to Steichen stating his intent to pay in full but doubting he could do so by April 1, Buck responded:

> We'll set it up as an HOA financed installment payment ($10,000 down, 15 year am; 5 year fixed rate; <u>monthly payments</u>; front-end financing cost spread over year one allocated prorate per % interests among the financing owners; $250 prepayment fee).

(Emphasis added.) Steichen did not object to this plan.

The Association did not start assessing Steichen monthly installments until June 1, 2017. Steichen began receiving delinquency notices from CWD later that month. The initial $10,000 payment Steichen promised to pay was not made until December 29, 2017, after his account was sent to collections.

One who would otherwise be liable for conversion is not liable if the other has effectively consented to the interference with his rights. <u>Michel v. Melgren</u>, 70 Wn. App. 373, 378, 853 P.2d 940 (1993) (citing Restatement (Second) of Torts § 252, at 482 (1965)). Consent may be express or implied. <u>Michel</u>, 70 Wn. App. at 378 (citing 18 Am. Jur. 2d <u>Conversion</u> § 93, at 210 (1985)).

Steichen did not give CWD express consent to debit payments for the special assessment from his bank account. But Steichen agreed to pay the special assessment several times. And Steichen knew that he would be placed on the installment plan if he did not make a payment by April 1. CWD had authority from the Association's Declaration to request, demand, collect, and receive any charges. Thus, Steichen impliedly consented to these payments toward the special assessment.

Generally, if property is conveyed to another with the consent of the owner, a conversion does not occur until the owner makes a demand for the return of the property and that demand is refused. Persson v. McKay Coal. Co., 200 Wash. 75, 77, 92 P.2d 1108 (1939). Steichen has presented no evidence that before filing this lawsuit he ever demanded a refund for these particular debits.

Finally, conversion is a tort, for which the measure of damages is the value of the article converted at the time of taking. Wash. State Bank v. Medalia Healthcare L.L.C., 96 Wn. App. 547, 554, 984 P.2d 1041 (1999). If the tort generates a benefit to the plaintiff, there may be no damages for the claim. Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 71 (1st Cir. 2005) (damage suffered from alleged conversion would have to be offset by the benefit conferred). As discussed above, the special assessment was validly adopted and ratified by Steichen. It is also undisputed that Steichen fell behind on his monthly dues and that his December 5, 2017 monthly dues were returned for nonsufficient funds. Thus, whether the three charges for $382.89 went toward the special assessment, Steichen's unpaid December 2017 monthly dues, or an unpaid window repair charge from August 2017,[19] they went toward debts validly owed by Steichen.

The trial court did not err in dismissing the conversion claims on summary judgment.

---

[19] It was the Association's policy to apply payments to the oldest amount due first.

M

Steichen's thirteenth and final argument is that the trial judge erred by denying his motion for disqualification.  We disagree.

We review a trial court's denial of a motion that it recuse for an abuse of discretion.  In re Marriage of Meredith, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009).  A trial court is presumed to perform its functions regularly and properly without bias or prejudice.  "Due process, the appearance of fairness, and Canon 3(D)(1) of the Code of Judicial Conduct (CJC) require that a judge disqualify themselves from hearing a case if that judge is biased against a party or if his or her impartiality may be reasonably questioned."  Meredith, 148 Wn. App. at 903.  "The test for determining whether a judge's impartiality might reasonably be questioned is an objective one that assumes the reasonable person knows and understands all the relevant facts."  In re Est. of Hayes, 185 Wn. App. 567, 607, 342 P.3d 1161 (2015) (citing Sherman v. State, 128 Wn.2d 164, 206, 905 P.2d 355 (1995)).  The party claiming bias or prejudice must produce sufficient evidence demonstrating actual or potential bias, such as personal or pecuniary interest on the part of the judge; mere speculation is not enough.  Kok v. Tacoma Sch. Dist. No.10, 179 Wn. App. 10, 23-24, 317 P.3d 481 (2013) (citing In re Pers. Restraint of Haynes, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000)).

The right of a litigant to disqualify a judge from sitting in a pending case on the ground of bias or prejudice known to the litigant may be impliedly waived if the right to disqualify is not timely asserted.  Williams & Mauseth Ins. Brokers, Inc. v. Chapple, 11 Wn. App. 623, 626, 524 P.2d 431 (1974).  A party may not, after learning of grounds for disqualification, proceed until the court rules adversely to him and then claim the judge

is disqualified.  State ex rel. Lefebvre v. Clifford, 65 Wash. 313, 316, 118 P.40 (1911);

Brauhn v. Brauhn, 10 Wn. App. 592, 597, 518 P.2d 1089 (1974).

In his brief, Steichen first asserts that at the inception of the case, the trial court made known its antipathy for condominium owners.  Steichen points to the trial judge's statement made during a hearing on May 31, 2019:

> I'm always amazed at how this proceeds, because it's usually over a couple of thousand bucks.  And then within a couple of years, the fees and interest and everything, now we've got a dispute that's hundreds of thousands of dollars, and it all started because of someone didn't want to pay an assessment of a couple thousand dollars for improvement of a common area or working on the roof of the building or something.  And they say, 'Ah, well, there wasn't a majority at the time that this was passed by the board,' or they come up with some legal argument.  But meanwhile, tens of thousands of dollars in fees have gone by.

Steichen did not move to disqualify the trial judge until January 4, 2021.  By January 2021, the trial date, which had been continued three times, was less than a month away.  In the interim, the trial court held approximately 17 hearings and issued around 60 orders in this case.  Steichen has waived this argument.  In any case, the trial judge's statement did not reflect bias—it reflected the court's experience in dealing with claims such as Steichen's.

Steichen next asserts the trial judge failed to adequately prepare.  Steichen points to a misunderstanding that occurred at the first hearing before the court on March 3, 2019, when the court mistook Steichen's counsel, his daughter, to be Steichen, the plaintiff.  During a colloquy addressing Steichen's claim for conversion of property as it related to Steichen's power being turned off, the following discussion occurred:

> THE COURT:  Oh, I know, with the electricity and you couldn't use your thing at your place anymore.

MS. STEICHEN: Sorry, I think that everyone's a little confused. It just—it's not mine. I am representing my dad. I think that's where the "he/she" things are getting a little confusing.

THE COURT: Oh. I didn't understand that. So you're not actually the owner at all?

MS. STEICHEN: No.

After it was explained to the court that counsel was Steichen's daughter, the hearing continued. Steichen fails to explain how this initial confusion demonstrated bias; it was obviously a misunderstanding as both Steichen and his counsel shared a last name. And again, even if the misunderstanding demonstrated bias Steichen waived any claim of bias by not seeking disqualification sooner.

Steichen next points to a colloquy that occurred during a hearing in December 2019 where the trial court was trying to discern who filed a declaration:

MS. STEICHEN: It's from [Alison] Steichen. It was saying that she—

THE COURT: You filed about 25 declarations, so that doesn't help me.

MS. STEICHEN: It's not. It's the person—

THE COURT: Aren't you [Alison]?

MS. STEICHEN: —that was living there. No. Ashley.

THE COURT: You're Ashley. I'm sorry.

MS. STEICHEN: That's okay. [Alison] was the one that was living there at the time.

Appellant's brief omitted the trial court's apology. This case involves multiple members of the Steichen family. Steichen's counsel, Ashley Steichen, is his daughter and shares the same last name. Alison Steichen is Steichen's other daughter and lived in the condominium unit at the time the special assessment was approved. Again,

Steichen fails to explain how another simple misunderstanding demonstrates bias. The trial court recognized its confusion and apologized and Steichen's counsel accepted the apology.

Next, Steichen raises issues with the trial court's conduct at a hearing on July 31, 2020. There, the trial court considered Steichen's motion to continue the trial date and asked for what discovery Steichen's counsel believed was outstanding and had not been done in the last 18 months. The trial court then spent a significant portion of time discussing discovery issues with counsel for all parties and offered to conduct a discovery conference if needed.

Before denying Steichen's motion to continue, the trial court explained:

> I am sympathetic to you having had Covid. From what I understand, it does have lingering and lasting effects for many of the people that it has infected, and so I'm very sympathetic to that.
> But on the other hand, I have gotten to know you over the last year and a half and I know the amount of work that you are able to put out when all engines are firing. And so I need to have much more information from you about what specifically you need to do and why you haven't been able to do it, and why it was those two months of COVID really prevented you from being prepared.

The trial court then denied the motion without prejudice and told counsel for Steichen that he would consider a renewed motion under the good cause standard instead of the extraordinary circumstances standard. At this point in the case, it was clear that discovery was close to completion and thus the case was on track for trial.[20]

---

[20] Steichen also asserts the trial court "berated" Steichen's counsel at a hearing. But this transcript cannot be found in the voluminous record and Steichen's citations to the record lack the statements alleged by Steichen.

The rest of Steichen's argument in the briefing pertains mostly to orders that Steichen has appealed and that have been discussed earlier in this opinion. Judicial rulings alone "almost never constitute a valid showing of bias." In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

Finally, Steichen references a failed recording and makes several disparaging assertions about what occurred off the record and how the recording was disconnected. The King County Superior Court Clerk sent a letter to the parties on December 14, 2020, stating that there was a problem with the recording on October 9, 2020. The letter stated that the recording "unexpectedly" stopped recording 10 minutes after the hearing started and the problem was not noticed until a copy of the hearing was requested. The trial court provided an extensive discussion of this unfortunate accident. Rather than accept that an accident occurred, Steichen speculates wildly on what happened.

Here, a reasonably prudent person would conclude that Steichen obtained fair hearings. Although the trial court ultimately dismissed most of Steichen's claims, he did enter several orders in Steichen's favor during the proceedings. For example, the trial court granted at least two of Steichen's motions to change the trial date over the objections of respondents. The trial court granted several of Steichen's motions to shorten time, to extend time to respond, and to file over-length briefs. The trial court denied summary judgment to the respondents on several occasions. The trial court also granted Steichen reconsideration on several occasions and reinstated several claims.

After reviewing the record, we cannot conclude that the trial court abused its discretion in denying the motion for disqualification.

III

All parties request fees on appeal. Under RAP 18.1, we may grant attorney fees "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." As discussed above, the WCA grants discretion for the court "in an appropriate case," to award reasonable attorney fees to the prevailing party. RCW 64.34.455; see also Mohandessi, 13 Wn. App. 2d at 707-08 (awarding attorney fees on appeal under RCW 64.34.455). Here, the Association, CWD, and CLG are the prevailing parties; subject to compliance with RAP 18.1, we award their attorney fees on appeal.

We affirm.

_____
Mann, J.


WE CONCUR:

_____          _____
Bowman, J                          Smith, C.J.